Brian M. Rothschild, USB #15316
**Parsons Behle & Latimer**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  801.532.1234
Facsimile:  801.536.6111
BRothschild@parsonsbehle.com
ecf@parsonsbehle.com

Joshua Konecky, *pro hac vice pending*
jkonecky@schneiderwallace.com
Nathan Piller, *pro hac vice pending*
npiller@schneiderwallace.com
**SCHNEIDER WALLACE COTTRELL
KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, California 94608
Tel: (415) 421-7100
Fax: (415) 421-7105

Attorneys for Objector Marty Cook

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| WILLIAM H. GRADIE, MILTON HARPER, RONNIE STEVENSON, and JONATHAN MITCHELL, individuals, on behalf of themselves, and on behalf of all persons similarly situated,<br><br>Plaintiffs,<br>vs.<br><br>C.R. ENGLAND, INC., a Corporation; and Does 1 through 100, Inclusive,<br><br>Defendants. | Case No:  2:16-cv-00768-DN<br><br>Judge: Hon. David Nuffer<br><br>**OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT BY OBJECTOR MARTY COOK**<br><br>Hearing Date: October 26, 2020<br>Time: 8:30 a.m. |

**TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................................1

II.  REQUIRED INFORMATION REGARDING OBJECTOR COOK ........................3

III. BACKGROUND ....................................................................................................3

   A.  Plaintiff Harper filed his Complaint against Defendant in California. ...............................3

   B.  The *Harper* Plaintiffs and Defendant Reached a Settlement Before Defendant's Responsive Pleading Deadline and Before Conducting any Discovery. ..........................4

   C.  Plaintiff Harper Stipulates to Transfer of the Case to Utah. ................................4

   D.  Harper and C.R. England informed the Court of the Settlement. .......................4

   E.  The *Harper* Plaintiffs Failed to Challenge Defendant's Unenforceable Arbitration Clause and Oppose Consolidation with Another Case Challenging the Same Arbitration Clause. 5

   F.  The *Gradie* Objectors Raised Serious Concerns Regarding the Proposed *Harper* Settlement. ............................................................................................6

   G.  The Tenth Circuit Remanded *Harper* to the District Court Based on Concerns Raised by the *Gradie* Objectors.............................................................................8

   H.  The District Court Rejected the Settlement Based on Antagonisms Between Plaintiffs and the Class.................................................................................................9

   I.  Claims for Unpaid Time While Subject to the Employer's Control in the Truck's Sleeper Berth are Successfully Prosecuted in Analogous Cases, Resulting in Strong Claims for Substantial Additional Recovery on the Same Causes of Action Asserted in *Harper* and *Gradie*. ...................................................................................................9

   J.  The *Harper* and *Gradie* Plaintiffs Coordinated to Propose a Settlement that Extends the Prior Release Period by Four Years and Broadens the Release to Cover Twice as Many Absent Class Members. .................................................................................11

IV.  ARGUMENT .......................................................................................................15

   A.  The Proposed Settlement is Not Fair, Adequate or Reasonable to Absent Class Members 15

      1.  The Proposed Settlement Represents a Grossly Inadequate Discount on the Verdict Value of the Claims. ..........................................................................16

      2.  The Lack of Discovery Precludes Careful Evaluation of the Class Claims ...............19

      3.  The "Debt Forgiveness" Component of the Proposed Settlement Provides Little Value and Results in the Inequitable Treatment of Absent Class Members. ........................20

      4.  The Settlement Value Is Artificially Depressed by the Plaintiffs' Failure to Establish the Unenforceability of Defendant's Arbitration Clause. ...........................................22

5.   The Plaintiffs' Decision to Release Claims for Time While Subject to Defendant's Control in the Sleeper Berth Without Investigating or Prosecuting them Harms Absent Class Members ........................................................................................................24

6.   The Circumstances Strongly Indicate that the Settlement was Not Negotiated at Arms-Length. ....................................................................................................................26

B.   The Proposed Settlement Impermissibly Releases PAGA Claims for Absent Class Members. ...........................................................................................................................28

V.   CONCLUSION ..................................................................................................................29

OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT

# TABLE OF AUTHORITIES

**Cases**

*AFL-CIO v. Superior Court*
46 Cal. 4th 993, 1003 (2009) ................................................................. 26

*Amalgamated Transit Union, Local*
1756 46 Cal. 4th 993, 1003 (2009) .......................................................... 26

*Baumann v. Chase Inv. Servs. Corp.*
747 F.3d 1117 (9th Cir. 2014) ................................................................. 26

*Bode, et al. v. C.R. England, Inc.*
Case No. 3:20-cv-01620-JCS (N.D. Cal. 2020)................................... 11, 26

*Brinker Restaurant Corporation v. Superior Court*
53 Cal.4th 1004 (2012) ........................................................................... 16

*Browne v. P.A.M. Transp., Inc.*,
No. 5:16-CV-5366 2018 U.S. Dist. LEXIS 180189 (W.D. Ark. Oct. 19, 2018) ..................... 10

*Browne v. P.A.M. Transp.*
No. 5:16-CV-5366 2020 U.S. Dist. LEXIS 135956 (W.D. Ark. July 31, 2020) ..................... 10

*Circuit City Stores, Inc. v. Adams*
532 U.S. 105 (2001)................................................................................. 21

*Devlin v. Scardelletti*
536 U.S. 1, 122 (2002)............................................................................. 17

*Douglas v. United States Dist. Court*
495 F.3d 1062, 1067 n.2 (9th Cir. 2007) ................................................. 22

*Garrido v. Air Liquide Indus. U.S. LP*
241 Cal. App. 4th at 845 (2015) .............................................................. 21

*Epic Systems Corp. v. Lewis*
138 S.Ct. 1612, 200 L.Ed.2d 889 (2018) ................................................ 21

*Esparza v. KS Indus.L.P.*
13 Cal. App. 5th 1228 (2017) .................................................................. 27

*Gentry v. Superior Court*
42 Cal. 4th 443, 463 (2007) ..................................................................... 21

*Gottlieb v. Wiles*
11 F.3d 1004, 1015 (10th Cir. 1993) ....................................................... 17

*Hanlon v. Chrysler Corp.*
150 F.3d 1011, 1026 (9th Cir. 1998) .................................................................. 14

*Harper v. C.R. Eng., Inc.*
746 F. App'x 712 (10th Cir. 2018) ........................................................................8

*Harper v. C.R. England, Inc.*
No. 2:16-cv-906, 2019 U.S. Dist. LEXIS 52689 (D. Utah Mar. 27, 2019) ............................. 8

*Haworth v. New Prime*
No. 6:19-03025-CV-RK, 2020 U.S. Dist. LEXIS 49590 (W.D. Mo. Mar. 23, 2020).............. 10

*In re Motor Fuel Temperature Sales Practices Litig.*
271 F.R.D. 263 (D. Kan. 2010)............................................................................ 14

*In re Vortex Fishing Sys., Inc.*
277 F.3d 1057 (9th Cir. 2001) .......................................................................... 22

*In re Warfarin Sodium Antitrust Litig.*
391 F.3d 516 (3d Cir. 2004).............................................................................. 14

*Iskanian v. CLS Transp. Los Angeles, LLC*
59 Cal. 4th 348 (2014) ............................................................................. 22, 26

*Julian v. Swift Transp. Co. Inc.*
2019 U.S. Dist. LEXIS 221423 (D. Ariz. Dec. 27, 2019) .................................. 10, 23

*Julian v. Swift Transp. Co. Inc.*
360 F. Supp. 2d 932 (D. Ariz. 2018) .................................................................. 10

*Linney v. Cellular Alaska Partnership*
51 F.3d 1234, 1239 (9th Cir. 1998) .................................................................... 18

*Maravilla v. Rosas Bros. Constr.*
401 F. Supp. 3d 886, 898 (N.D. Cal. 2019) .......................................................... 23

*New Prime Inc. v. Oliveira*
139 S. Ct. 532 (2019)..................................................................................... 21

*Ridgeway v. Walmart Inc.*
946 F.3d 1066, 1081,1083 (9th Cir. 2020) ............................................................  9

*Ridgeway v. Wal-Mart Stores, Inc.*
107 F. Supp. 3d 1044, 1055 (N.D. Cal. 2015) .......................................................  9

*Ridgway v. Wal-Mart Stores Inc.*
2017 U.S. Dist. LEXIS 66228 (N.D. Cal. May 1, 2017)....................................... 9, 23

*Rodriguez v. Kraft Foods Group*
2016 U.S. Dist. LEXIS 138652, *23, 2016 WL 5844378 (E.D. Cal. October 4, 2016)...........18

*Roes v. SFBSC Mgmt., LLC*
944 F.3d 1035, 1048 (9th Cir. 2019) ...................................................................................12, 24

*Sakkab v. Luxottica Retail N. Am., Inc.*
803 F.3d 425, 435 (9th Cir. 2015) .....................................................................................26

*Saravia v. Dynamex, Inc.*
310 F.R.D. 412, 419 (N.D. Cal. 2015)..............................................................................22

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*
463 F.3d 646, 654 (7th Cir. 2006) .....................................................................................20

*Veliz v. Cintas Corp.*
2004 U.S. Dist. LEXIS 32208 (N.D. Cal. Apr. 5, 2004.......................................................21

*Ybarrondo v. NCO Fin. Sys.*
2008 U.S. Dist. LEXIS 4353, at *5-6 (S.D. Cal. Jan. 18, 2008)............................................20

**Statutes and Rules**

(Labor Code § 2698 et. seq.) ("PAGA")........................................................................ 19

§ 226.2...................................................................................................................... 8

226(a) of the California Labor Code............................................................................. 7

9 USC § 1................................................................................................................. 24

*Amalgamated Transit Union, Local 1756*................................................................. 31

Cal Code Civ Proc § 337(d)........................................................................................ 23

Cal Const, Art. XV § 1................................................................................................ 15

California Labor Code § 1194.2................................................................................... 18

California Labor Code § 226(a) and (e)........................................................................ 19

California Labor Code § 226(a)-(e).............................................................................. 19

California Labor Code § 226.7 .................................................................................... 18

California Labor Code §§ 201-202............................................................................... 19

Fed. R.Civ.Proc. 23(e)(1)(C)...................................................................................... 16

Fed. R.Civ.Proc. 23(e)(2)........................................................................................... 16

OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT

Federal Arbitration Act. *See* Section IV.A.4, *infra* ........................................................... 5, 7

Labor Code § 229 ........................................................................................................ 25

Labor Code §§ 200-243 ............................................................................................... 25

Labor Code §§ 2699(a), (f) .......................................................................................... 19

Labor Code §226.2(b) ................................................................................................... 8

Labor Code's "safe harbor" provision ........................................................................... 7

Manual for Complex Lit. (4th) at § 21.61 .................................................................... 16

Manual for Complex Litigation, Fourth § 21.612, at 313 (2004) ................................ 17

Newberg on Class Actions § 13:57 (5th ed.) ............................................................... 31

*See* Cal Const, Art. XV § 1. ........................................................................................ 7

OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT

## I.     INTRODUCTION

Objector, Marty Cook, is a former truck driver for Defendant C.R. England, Inc. ("Defendant" or "C.R. England") and an absent class member.  Mr. Cook objects to the proposed class action settlement of the California state law wage and hour claims at issue in this case.  As discussed below, the settlement value is paltry in comparison to value of the California state law claims being released for a class of more than 12,600 employees.  Moreover, the statements made in the motion for settlement approval concerning the purported value of the settlement to the class are both misleading and demonstrably false.  In addition, the settlement was hastily negotiated before the case even reached this Court, with zero discovery or vetting of the legal claims, and in a manner that was wholly inadequate to safeguard the important substantive rights of the absent class members.  The settlement also has an irrational and inequitable mechanism for distributing what little settlement funds there are.  Relatedly, the settlement terms leave many class members in a worse and more vulnerable position than they would be without the settlement. In sum, the settlement is a windfall for Defendant and should not be approved.

This is the Parties' third attempt to secure court approval of a hastily negotiated settlement. In fact, Named Plaintiff Milton Harper and his attorneys first filed this case in California state court in February 2016.  Six months later, on August 19, 2016, he agreed with Defendant to the material terms of a class action settlement.  There was no discovery or prosecution of the claims during these six months.  Although the settlement concerned California state law claims, the parties did not seek approval from the California state court where the case was pending at the time of the agreement.  Rather, the parties agreed to have the case removed to federal court and then transferred to this Court for the settlement approval process.  There are no claims under Federal law or even Utah state law.

After the transfer, the parties quickly moved the Court for settlement approval, which was granted, but then vacated by the Tenth Circuit due to the lack of rigor in the approval process. Rather than improving the settlement or removing its deficiencies, the parties again sought hasty approval, which was denied.  Now, on their third attempt, the parties are presenting a re-do of the deficient settlement.  Only this time, the settlement is even worse.  Indeed, the per-person

OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT

settlement value of the current version of the settlement is just a little over half the per-person settlement value of the two previous versions that were not approved. In the meantime, the current version offers Defendant a release that covers 6,000 more class members than the previous versions—a sweetheart deal to say the least.

The Court has an important gatekeeping role here in determining whether to approve the settlement, which affects more than 12,600 absent class members who are not individually before the Court. This review process demands even closer scrutiny in this situation, where a class action settlement was negotiated before Rule 23 certification; indeed, before the case even reached this Court. The settlement just does not stand up to scrutiny.

The proposed settlement provides a net cash recovery of less than $2 million to be distributed between over 12,600 employees who, according to the pleadings, have been subject to serious wage violations and usury at the hands of Defendant and its third-party debt collectors. This net recovery is after attorneys' fees of $1.44 million and other amounts are taken from the common fund. While there is a $400,000 increase in the net cash payout to class members from the prior failed settlement, the number of class members has increased from approximately 6,400 to 12,600 due to the release period extending by three and a half years. The result is a substantial decrease in the settlement value for class members when compared to the previously rejected settlements.

Remarkably, Plaintiffs misrepresent the average recovery under the settlement as being "roughly" $273 when in reality the average recovery is $156 (the net cash payout of approximately $1,966,000 divided by 12,600 class members). To add to the confusion, the motion for approval does not even provide information on the number of workweeks that the class members worked, perhaps because the Plaintiffs negotiated the settlement without first obtaining discovery to determine and verify this information. Yet, the number of workweeks covered by the settlement payments is a critical component to measuring settlement value. Still, that datapoint is conspicuously absent here.

Putting aside the imprecision of the Plaintiffs' analysis and the lack of careful consideration it reveals, the recovery here still represents a staggering discount on the verdict

value of the claims.  Even using a lower estimate for the number of workweeks per person that was previously advanced by the *Gradie* Plaintiffs—who now are parties to the settlement—the cash recovery represents a 99% discount on the verdict value of the claims at issue.  The verdict value is in the hundreds of millions of dollars.  While any settlement requires compromise, the approximate 99% discount here is simply not justified by any measure of fair, reasonable, or adequate.  As just one example, the plaintiffs in a highly analogous case against one of Defendant's competitors recently won summary judgment and an award of damages on one of the claims for which the plaintiffs here have received nothing, but are nonetheless attempting to release in full through this settlement.  Moreover, as discussed further below, the purported reasons the parties have provided for the eye-popping discount betray an outright lack of investigation into or consideration of the key legal questions that would have been at issue had this case been even modestly litigated.

For all the reasons discussed herein, the settlement should not be approved.

## II.     REQUIRED INFORMATION REGARDING OBJECTOR COOK

The *Harper/Gradie* Notice of Settlement directs that objectors provide their full name, address, and dates of employment with Defendant.  Objector Cook provides this information below:

<u>Name</u>: Marty Cook

<u>Address</u>: 221 Barbe Ct. Arbuckle, CA 95912

<u>Dates of Employment</u>: Approximately June 2016 to February 2017

## III.    BACKGROUND

### A.      Plaintiff Harper filed his Complaint against Defendant in California.

On February 2, 2016, Plaintiff Milton Harper filed a putative class action case against Defendant in San Bernardino, CA Superior Court, alleging, *inter alia*, unpaid minimum wages under the California Labor Code.  *See* Ntc. Of Removal, *Harper* Dkt. 1-2.  The gravamen of Plaintiff Harper's Complaint was that Defendant's piece-rate pay scheme did not comply with California Law because it did not cover non-driving tasks such as pre- and post-trip inspections, fueling, and time spent waiting for Defendant's loads to be made available for transport.  *See id*.

at ¶¶ 1, 6.   On August 8, 2016, Plaintiff Harper served Defendant with a Second Amended Complaint (SAC) adding claims for, *inter alia*, noncompliant meal and rest periods and unpaid overtime under California law.  *See* SAC, *Harper* Dkt. 1-6.

> **B.** **The *Harper* Plaintiffs and Defendant Reached a Settlement Before Defendant's Responsive Pleading Deadline and Before Conducting any Discovery.**

On August 19, 2016, the parties reached a settlement in principle.  *Harper* Dkt. 27-1, at p. 6.  As discussed below, this occurred before the case was removed from California state court and transferred to this Court.  It also occurred without responsive pleadings, discovery, or motion practice to vet any of the claims or defenses asserted.

> **C.** **Plaintiff Harper Stipulates to Transfer of the Case to Utah.**

On August 24, 2016, Defendant removed the case to the United States District Court, Central District of California.  *Harper* Dkt. 1.  Harper did not contest removal.  On August 25, 2016—one day after removal from state court—Harper stipulated to transferring his case to the United States District Court, District of Utah, the jurisdiction where Defendant's headquarters is located. *Harper* Dkt. 10.  Despite filing the case in California agreeing to the settlement while the case was still pending in California, Harper stipulated that "this action must be transferred to the District of Utah[.]"  *Id.* at ¶ 8.  The case was transferred on August 26, 2016. *Harper* Dkt. 12.

> **D.** **Harper and C.R. England informed the Court of the Settlement.**

 On August 30, 2016—4 days after transfer—Harper notified the Court of a proposed settlement with Defendant.  *Harper* Dkt. 19.  The proposed class action settlement was for $2,350,000.  *Id.* at p.1.  Harper estimated that after attorneys' fees and costs, administration costs and proposed service awards, participating class members would recover "roughly" $273 on average.  *Harper* Dkt. 27-1, at p. 15.  Harper described this as "an excellent result for the Class Members in light of the disputes as to the merits of their claims, uncertainty as to whether class certification could be obtained, the fact that almost all Class Members agreed to individual arbitration agreements with class action waivers, and numerous other factors."  *See Harper* Dkt. 34, at p. 3.  But Harper did not conduct discovery to evaluate these risks—or conduct any formal discovery at all—before the settlement.  Rather, the settlement was negotiated based on "informal

discovery" provided before the mediation. *Harper* Dkt. 27-1. at p. 5. Harper submitted vague descriptions of the information provided, including that it contained purported data for the class members. *See id*.

Moreover, it appears the *Harper* Plaintiffs did not even consider critical legal decisions that impact his statements concerning settlement value, including settled Supreme Court precedent that "transportation workers," such as the plaintiffs here, are not subject to the Federal Arbitration Act. *See* Section IV.A.4, *infra*. Despite the patent unenforceability of the arbitration agreements, Harper put this risk factor at the forefront of his justifications for the low settlement value.

The *Harper* Plaintiffs also were not able to ascertain the number of class members at the time of the settlement, even though they purport to have conducted "informal discovery" and obtained class data. At the time of the motion for preliminary approval, the *Harper* Plaintiffs represented that "the Settlement Class is composed of approximately 5,900 class members." *Harper* Dkt. 27-1, Nordrehaug Declaration, at ¶ 29. Less than two weeks later, the *Harper* Plaintiffs represented that there actually were 6,432 class members. *Harper* Dkt. 34-1, Nordrehaug Decl. at ¶ 3(d). The *Harper* Plaintiffs also did not provide the number of workweeks at issue and the average wage rates for class members—figures that are necessary to evaluate the value of the settlement being negotiated and which the Plaintiffs presumably could have determined had they conducted formal discovery.

### E. The *Harper* Plaintiffs Failed to Challenge Defendant's Unenforceable Arbitration Clause and Oppose Consolidation with Another Case Challenging the Same Arbitration Clause.

The *Harper* Plaintiffs repeatedly stressed that the settlement amount represented a strong result in light of purported litigation risks created by class members' arbitration agreements with Defendant. But as discussed in Section IV.A.4, *infra*, the class members are exempt from the Federal Arbitration Act, and the class action waivers in the arbitration agreements are unenforceable under California law. Nonetheless, the *Harper* Plaintiffs did not litigate the enforceability of the arbitration agreements. Instead, they negotiated the settlement with Defendant under the erroneous presumption that the arbitration agreements would have to be

enforced.  The *Harper* Plaintiffs did so while a parallel declaratory relief action challenging the enforceability of the same arbitration agreements was pending—also in the District of Utah.  *See Gradie II*, 2:16-cv-01015-DN.

CRE did move to compel arbitration in the *Gradie* case. *See Gradie*, 2:16-cv-00768-DN, Dkt. 46.  While the motion was being briefed, the *Gradie* plaintiffs moved to consolidate their case with *Harper*.  The *Harper* plaintiffs opposed the motion to consolidate because it would interfere with their settlement, despite the possibility that a favorable outcome on the arbitration issue being litigated in *Gradie* would have added substantial value to the class claims.  *Cf. Gradie* Dkt. 52.  Before the *Gradie* Court ruled on the motion to compel arbitration, the Court in *Harper* granted final approval of the proposed settlement.  *Harper* Dkt. 70.  Thereafter, Defendant filed a supplemental memorandum requesting that the Court in *Gradie* stay the case in light of settlement approval in *Harper*. *Gradie* Dkt. 62.  The Court in *Gradie* never ruled on the motion to compel arbitration, but rather stayed the case "until *Harper* becomes completely final, *i.e.* all appellate rights have been exhausted." *Gradie* Dkt. 63.

## F.     The *Gradie* Objectors Raised Serious Concerns Regarding the Proposed *Harper* Settlement.

Following preliminary approval of the original *Harper* settlement, the *Gradie* Plaintiffs filed Objections to the proposed settlement.  *Harper* Dkt. 37.  The objections raised several red flags indicating that the proposed settlement was the product of collusion.  These included the "fact that Harper's Counsel agreed to enter into a settlement without conducting any discovery and without obtaining the information – such as total work weeks and wage rates of the class – necessary to determine the potential value of the class claims"; that the *Harper* Plaintiffs never executed the contracts[1] that formed the basis of the already-filed *Gradie* action, and yet added these same legal claims to an amended complaint, just before reaching the settlement; and that the settlement may have prevented class members from receiving a larger recovery through Defendant's invocation of the Labor Code's "safe harbor" provision.  *See id*. at 10.

---

[1] *See* Section III.F below for a further discussion of the contracts issue and the "safe harbor" provision.

The *Gradie* objectors also presented an analysis showing that a reasonable estimate of the total "verdict value" of the class claims exceeded $300 million. *See id.* at 18.  As just one example, Defendant itself estimated that the verdict value of the claim for inaccurate wage statements under section 226(a) of the California Labor Code alone would be $6 million for 1,500 class members, which is approximately $24 million when extrapolated to the more than 6,000 class members identified at the time of the settlement. *See* Harper Dkt. 1, at ¶¶ 16-18.  The *Gradie* objectors presented further calculations of damages under the California Labor Code, arising from the allegedly unlawful piece rate pay scheme, conservatively estimating a verdict value for the Labor Code claims of $161 million.  *Harper* Dkt. 37. At 18-19.  This valuation also did not take into account the large swaths of unpaid time that class members spent in the "sleeper berth" of the truck, while still subject to Defendant's control.  As discussed in Section IV.A.5, *infra*, this time is compensable under California law and, if pursued, could reasonably have added hundreds of millions of dollars more to the recovery.

The *Gradie* Objectors also estimated a $139 million verdict value of the contract claims for reimbursement of training costs, restitution of illegal "liquidated damages" charged upon termination of the contracts, treble damages for usury, and related statutory penalties for imposing illegal contract terms as a condition of employment. *See id*.  The *Gradie* Objectors observed that these contract claims addressing Defendant's liquidated damages provision charging $2,500 upon contract termination and usurious 18% rate of interest—both of which a facial violations of California law—were a "slam dunk."  *Id*. at p. 16.  (The California Constitution caps annual percentage interest rates at 10%. *See* Cal Const, Art. XV § 1.)  The *Harper* Plaintiffs did not explain whether the settlement amount incorporated value for these contract claims that were taken from the *Gradie* Compliant and served on Defendant days before the mediation.

The *Gradie* Objectors further demonstrated that the original *Harper* Settlement would pay out less than what Defendant represented it might have paid under the California Labor Code's "safe harbor" provision, had the case not settled.  According to *Harper's* counsel, Defendant represented that it would have ultimately made payments to the putative Class under the "safe harbor" provision for employees paid on a "piece rate" basis in the years preceding codification

of piece rate requirements under § 226.2, if the case had not settled. Nordrehaug Decl. iso Final Approval (*Harper* Dkt. 34-1) at ¶ 8(a). This "safe harbor" provision provides that in lieu of calculating the exact number of uncompensated hours, the employer must pay back wages equal to at least 4% of the employees' gross payroll for the covered period. *See* Labor Code §226.2(b). Had Defendant invoked the "safe harbor" provision instead of settling with the *Harper* Plaintiffs, putative class members likely would have received a much larger recovery than that proposed under the original settlement—and for only those claims based on Defendant's piece rate policies. *See Gradie* Objection (Dkt. 37) at 23 (estimating that putative class would have recovered at least $10 in payments under the "safe harbor" provision, more than $8 million in excess of the proposed net recovery under the settlement).

Notwithstanding the questions raised by the *Gradie* Objectors, the District Court granted final approval of the original *Harper* settlement on January 9, 2017. *Harper* Dkt. 71. The *Gradie* Objectors filed their notice of appeal to the Tenth Circuit on January 27, 2017. *Harper* Dkt. 73.

## G.   The Tenth Circuit Remanded *Harper* to the District Court Based on Concerns Raised by the *Gradie* Objectors.

On August 14, 2018, the Tenth Circuit vacated the District Court's order finally approving the *Harper* Settlement and remanded the case back to the District Court for further proceedings. *Harper v. C.R. Eng., Inc.*, 746 F. App'x 712, 722 (10th Cir. 2018). The Tenth Circuit found that the District Court "fell short of its obligation to analyze, independently and rigorously, the proposed class's suitability." *Id*.

In examining the deficiencies with regard to class certification, the Court discussed the serious questions raised by the *Gradie* Objectors regarding the propriety of the original *Harper* settlement that indicated the presence of collusion. For instance, the Tenth Circuit cited the *Gradie* Objectors' contentions that the *Harper* Plaintiffs "weren't party to any of the contract claims"; that these claims were only added "by joint agreement of the parties in preparation for their settlement"; and that the *Harper* Plaintiffs "never submitted any 'declaration or other admissible evidence' to show that  the Plaintiffs actually 'had viable claims' under the contract theories of liability." *Id*. at 720-721 (internal citations omitted). The Tenth Circuit observed that

the bare analysis in the District Court made it impossible to meaningfully evaluate these contentions and remanded for further examination. *Id*. The Tenth Circuit explicitly did not reach the merits of the *Gradie* Objectors' other objections because its threshold determination regarding the class certification analysis alone necessitated remand. *Id*. at 722.

### H. The District Court Rejected the Settlement Based on Antagonisms Between Plaintiffs and the Class.

Following the Tenth Circuit's ruling, the Honorable Dee Benson was recused, and the case was reassigned to the Honorable Robert J. Shelby. *Harper* Dkt. 79. On September 5, 2018, the *Harper* case was reopened for further proceedings, consistent with the Order of the Tenth Circuit. *Harper* Dkt. 80.

On November 13, 2018, the *Harper* Plaintiffs filed a renewed motion for approval of the original settlement. *Harper* Dkt. 85.

The District Court rejected the original *Harper* settlement on remand, observing that the Plaintiffs had failed to show "a lack of antagonistic interests and shared legal theory" between the Plaintiffs and absent class members. *Harper v. C.R. England, Inc.,* No. 2:16-cv-906, 2019 U.S. Dist. LEXIS 52689, at *8 (D. Utah Mar. 27, 2019). The Court went on to reason that "[t]he absence of evidence forecloses a finding that the interests of Plaintiffs and Class Members are aligned. If Plaintiffs lack a sincere stake in their asserted contract claims, then there is a collision of antagonistic interests: for every dime of settlement funds allocated to the contract claims, there is a concomitant decrease in Plaintiffs' recovery for the wage claims." *Id*. The Court denied the renewed motion for final approval. *Id*. at *12.

### I. Claims for Unpaid Time While Subject to the Employer's Control in the Truck's Sleeper Berth are Successfully Prosecuted in Analogous Cases, Resulting in Strong Claims for Substantial Additional Recovery on the Same Causes of Action Asserted in *Harper* and *Gradie*.

In the meantime, developments in analogous class action cases demonstrated the potential for substantial additional recovery based on the same minimum wage claims for unpaid non-driving time alleged in the operative complaint: unpaid "sleeper berth" time.

OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT

The "sleeper berth" is a cramped bunk in the cab of a long-haul truck where truck drivers must attempt to rest—often while the truck is being driven by a co-worker. There is no restroom in the sleeper berth, and yet drivers are often confined to the small facility indefinitely for their employer's benefit and while being subject to their employer's control—all without pay.

On May 28, 2015, in an analogous case seeking back wages for unpaid time worked by truck drivers under a similar pay scheme, the District Court for the Northern District of California held that time spent while logged in the trucks "sleeper berth" was compensable under California law because the drivers were still subject to the employer's control while in that status, under the defendant's policies. *Ridgeway v. Wal-Mart Stores, Inc*., 107 F. Supp. 3d 1044, 1055 (N.D. Cal. 2015).

The *Harper* Plaintiffs did not conduct discovery or investigate Defendant's pay policies for time spent in the sleeper berth while subject to the employer's control before negotiating the settlement, despite the *Ridgeway* decision coming down a year prior to *Harper*'s filing.

Thereafter, the jury in *Ridgeway* returned a verdict awarding $54.6 million in damages to the class in *Ridgeway*, with approximately $44 million attributable to unpaid sleeper berth time. *See Ridgway v. Wal-Mart Stores Inc*., 2017 U.S. Dist. LEXIS 66228, at *20 (N.D. Cal. May 1, 2017) (discussing history). On May 1, 2017, the District Court denied the defendant's post-trial motion for judgment as a matter of law and upheld the verdict. *Id*. The Ninth Circuit subsequently affirmed the District Court's rulings that time spent in the sleeper berths was compensable and that the jury verdict was supported by sufficient evidence. *Ridgeway v. Walmart Inc*., 946 F.3d 1066, 1081,1083 (9th Cir. 2020).

Following the Tenth Circuit's order remanding the original *Harper* settlement back to the district court, further decisions in other analogous cases reinforced the strength of the unpaid sleeper berth theory. For example, the Western District of Arkansas denied a motion to dismiss analogous unpaid sleeper berth claims in the case of *Browne v. P.A.M. Transp., Inc.*, No. 5:16-CV-5366, 2018 U.S. Dist. LEXIS 180189, at *16 (W.D. Ark. Oct. 19, 2018), paving the way for a class action settlement of $16.5 million. *Browne v. P.A.M. Transp.*, No. 5:16-CV-5366, 2020 U.S. Dist. LEXIS 135956, at *4 (W.D. Ark. July 31, 2020).

In another example, the District of Arizona ruled that an analogous collective of trainee truck drivers were on-duty continuously while transporting freight over-the-road, and thus were entitled to compensation for unpaid sleeper berth time. *Julian v. Swift Transp. Co. Inc.*, 360 F. Supp. 2d 932, 947, n.12 (D. Ariz. 2018). The *Julian* Court later awarded the opt-in collective $7,839,834 on summary judgment for sleeper berth time over 8 hours per day, *Julian v. Swift Transp. Co. Inc.*, 2019 U.S. Dist. LEXIS 221423, at *12-*18, *21 (D. Ariz. Dec. 27, 2019), with the bulk of the remaining unpaid sleeper berth and other unpaid time reserved for trial. *Julian*, No. CV-16-00576-PHX-ROS, Dkt. No. 276, Order dated May 8, 2020, at p. 1; *see also Haworth v. New Prime*, No. 6:19-03025-CV-RK, 2020 U.S. Dist. LEXIS 49590, at *16 (W.D. Mo. Mar. 23, 2020) (certifying analogous sleeper berth claim).[2]

Again, these favorable rulings were coming down in the same timeframe as the Tenth Circuit and the District Court's rejection of the original *Harper* Settlement. As discussed below, neither the *Harper* nor the *Gradie* Plaintiffs attempted to investigate these sleeper berth issues, but rather negotiated another pre-discovery class settlement.

### J. The *Harper* and *Gradie* Plaintiffs Coordinated to Propose a Settlement that Extends the Prior Release Period by Four Years and Broadens the Release to Cover Twice as Many Absent Class Members.

On April 30, 2019, Defendant and the *Harper* Plaintiffs notified the Court that they had scheduled a mediation to take place on June 13, 2019. *See Harper* Dkt. 88. On June 20, 2019, the *Harper* Plaintiffs and Defendant disclosed that the mediation had taken place with the participation of the *Gradie* Plaintiffs, wherein all parties had reached a global settlement to resolve the claims in both the *Harper* and *Gradie* actions. *See Harper* Dkt. 92, at p. 2.

---

[2] The *Browne*, *Julian* and *Haworth* cases alleged unpaid "sleeper berth" time under the Federal Fair Labor Standards Act (FLSA), which sets the floor for wage protections and is less protective than California law. *Troester v. Starbucks Corp.*, 5 Cal. 5th 829, 839 (2018). The federal standard requires that drivers be "on duty" under Department of Labor Regulations for the sleeper berth time to be compensable. *See Julian*, 360 F. Supp. 2d at 947, n.12. The standard for the compensability of sleeper berth time under California law is more lenient, merely requiring that employees not be able to use time effectively for their own purposes. *See Ridgeway*, 946 F.3d at 1082; *Ridgeway*, 107 F. Supp. 3d at 1054-55.

OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT

On October 19, 2019, former driver for Defendant and putative class member in *Harper/Gradie*, Jason Asher, submitted a letter to California's Labor and Workforce Development Agency stating his intent to file an action for, *inter alia*, civil penalties arising from Defendant's failure to pay for time spent subject to the employer's control while in the sleeper berth of the employer's truck.  Mr. Asher is a co-plaintiff with Objector Cook in the case of *Bode, et al. v. C.R. England, Inc.*, Case No. 3:20-cv-01620-JCS (N.D. Cal. 2020). Thereafter, Messrs. Asher and Cook, along with another former driver for Defendant, Mark Bode, filed their class action complaint based on unpaid sleeper berth time.  *See Bode, et al. v. C.R. England, Inc.*, Case No. 3:20-cv-01620-JCS (N.D. Cal. 2020), Dkt. 1.

The *Harper/Gradie* Plaintiffs and Defendant were still in the process of drafting the long-form settlement agreement as of November 15, 2019.  *Harper* Dkt. 94, at p. 2; *Gradie* Dkt. No. 64, at p. 4.  On February 24, 2020, the *Harper/Gradie* Plaintiffs submitted their long-form settlement agreement with Defendant to the Court.  *See Gradie* Dkt. 73-1.  The Settlement Agreement defines the "Claims" to be released broadly, and as including "all claims, causes of action, and associated relief regarding minimum wages, regular and straight time wages, overtime wages, hourly wages, piece-rate wages, wages for all time worked, wages for all miles driven, wages for both driving and non-driving time, wages for rest and recovery periods and all other non-productive time, and all other forms of wages and compensation of any kind whatsoever…" *Id*. at p. 4.  Again, the *Harper* and *Gradie* cases did not investigate the compensability of sleeper berth time, although the release is drafted broadly to cover such claims through its broad scope and the phrase "all other non-productive time."[3]

The proposed Settlement provides a gross cash settlement amount of $3.6 million.  *See* Settlement Agreement (Dkt. 73-1), at p. 9.  After attorneys' fees of $1.44 million; $90,000 in litigation costs; $48,000 in class representative service awards; and the $54,000 payment to the LWDA, the cash amount to be distributed to participating class members will be $1,968,000

---

[3] Time can be compensable under California law even if it is non-productive, including "rest and recovery" periods while subject to the employer's control.  Cal Lab Code § 226.2; *Ridgeway v. Walmart Inc.*, 946 F.3d 1066, 1079 (9th Cir. 2020).

before the costs of administrating the settlement are deducted.  This is an approximate increase of only $400,000 from the net amount that would have been distributed to participating class members under the original *Harper* Settlement.  *See* Dkt. 37 at pp. 20-21 (*Gradie* Objectors calculating prior net amount at $1,568,633).

The parties to the Settlement have not specified the number of workweeks at issue.  The Plaintiffs have, however, estimated that the cash recovery will be "roughly" $273 per class member.  *See* Nordrehaug Decl. (Dkt. 73-1) at paragraph 6.  The parties did not provide data or analysis to support this rough estimate.

The number of class members and the length of the release period shows that this rough figure is a gross over-estimation.  As observed by the Tenth Circuit, the original *Harper* Settlement had a release period running from "from March 12, 2014 through October 6, 2016." Harper, 746 F. App'x at 715 (10th Cir. 2018).  But in the instant proposed Settlement, the release period has been extended from approximately 31 months to 73 months (from March 12, 2014 through April 4, 2020), thereby more than doubling the length of the original release period.  This substantially increases the number of absent class members and covered workweeks.  Indeed, Plaintiffs' Counsel points out that there are "more than 12,600 class members." Nordrehaug Decl. (Gradie Dkt. 73-1) at p. 16.  Thus, contrary to the $273 "rough" estimate provided by Plaintiffs' counsel, the $1,968,000 net cash recovery divided by 12,600 class members works out to an average recovery of only $156.

Aside from a vague reference to an information exchange of documents, there is no indication that the *Harper/Gradie* Plaintiffs investigated Defendant's policies after October 2016, the end of the release period in the original *Harper* Settlement. *Cf.* Nordrehaugh Decl. (Dkt. 73-1) at p. 8.  Again, no formal discovery has been conducted in either case.

The *Harper/Gradie* Plaintiffs have attempted to defend the settlement amount by emphasizing the purported, additional $15 million "value" of the "Debt Forgiveness" provided under the Settlement.  This "Debt Forgiveness" is not a cash payment, but rather an agreement on Defendant's part not to demand payments that Plaintiffs maintain were never owed to begin with. There is no indication that Defendant has made a cross claim, initiated any proceeding, or

articulated any intent to assert claims for these disputed amounts before the case.  Plaintiffs are the only parties with outstanding legal claims pertaining to the usurious contracts.  Plaintiffs' operative complaint does not seek "Debt Forgiveness," but rather seeks restitution of the amounts paid, treble damages and statutory penalties against Defendant for usury, and disgorgement— none of which are provided under the settlement.  *Cf.* Compliant (*Gradie* Dkt. 67) at ¶¶ 38, 81. In other words, the settlement not only fails to secure value for the debt collection and usury claims Defendant that the *Gradie* Plaintiffs once described as "slam dunk" legal claims, but then obscures this shortcoming by suggesting that Defendant can clear itself of any restitution, damages and statutory penalties it may owe for past conduct, by simply agreeing that it will "forgive" usury interest rates and liquidated damages that were already invalid in the first place.

The "Debt Forgiveness" component also expressly excludes the principal amount Defendant claims it is owed, *see* Settlement Agreement (Dkt. 73-1) at Section XX, although the Plaintiffs seek the principal in the operative Complaint. *See* First Amended Complaint, *Gradie* Dkt. 67, at ¶¶ 38, 81.  Of the purported $15 million value, $11 million is attributable to interest payments Defendant claims would be owed by class members pursuant to their form contracts charging class members an 18% annual percentage rate. Settlement Agreement (Dkt. 73-1) at Section XX. The remaining $4 million is attributable to "liquidated damages" chargeable under Defendant's form contracts in the event of a breach of payment obligations, in the amount of $2,500. *Id.*  The liquidated damages and interest are the amounts that the *Gradie* Plaintiffs previously contended were so usurious as to give rise to a "slam dunk" legal claim. *See* Section III.F, *supra*.  Defendants' policies constitute a facial violation of California's usury laws and the California Constitution, which set a maximum rate of interest for the type of transaction here at 10% per annum. Cal Const, Art. XV § 1.  Despite the facial violation, the settlement does not provide absent class members who have already made the usurious interest and liquidated damages payments with restitution of these amounts.  At the same time, class members would be releasing their claims for usury, which would allow Defendant to attempt to collect the remaining debt free and clear of the substantial risk posed by the usury claims.

The *Harper/Gradie* Plaintiffs also defended the Settlement amount on the grounds that

"almost all Class Members signed individual arbitration agreements containing class action waivers that could bar any potential class action", *see Gradie* Dkt. 73, at p. 22, although they never litigated the issue of whether the class action waivers in the arbitration agreements are enforceable.  As discussed below, such waivers are unenforceable under California law.

IV.   **ARGUMENT**

**A.   The Proposed Settlement is Not Fair, Adequate or Reasonable to Absent Class Members**

Rule 23 provides that the Court must find that a proposed class action settlement "is fair, reasonable, and adequate" for it to be finally approved. Fed. R.Civ.Proc. 23(e)(1)(C).   The overarching question is "whether the interests of the class are better served by the settlement than by further litigation." Manual for Complex Lit. (4th) at § 21.61.   The judicial review process "must be exacting and thorough.  The task is demanding because the "adversariness" of litigation is often lost after the agreement to settle.  The settling parties frequently make a joint presentation of the benefits of the settlement without significant information about any drawbacks." *Id*. at § 21.6.

In 2018, Congress codified a multi-factor test, which considers whether: "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and; (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other."  Fed. R.Civ.Proc. 23(e)(2).

"It is generally accepted that where settlement precedes class certification, *e.g.*, approval for settlement and certification are sought simultaneously, as here, district courts must be 'even more scrupulous than usual' when examining the fairness of the proposed settlement."  *In re Motor Fuel Temperature Sales Practices Litig*., 271 F.R.D. 263, 270 (D. Kan. 2010) (citing *In re Warfarin Sodium Antitrust Litig*., 391 F.3d 516, 534 (3d Cir. 2004), *Hanlon v. Chrysler Corp*.,

150 F.3d 1011, 1026 (9th Cir. 1998)); *see also Roes v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048 (9th Cir. 2019) (reasoning that where "parties negotiate a settlement agreement before the class has been certified, 'settlement approval 'requires a higher standard of fairness' and 'a more probing inquiry than may normally be required under Rule 23(e).'") (citations omitted)); Manual for Complex Litigation, Fourth § 21.612, at 313 (2004) ("Class actions certified solely for settlement, particularly early in the case, sometimes make meaningful judicial review more difficult and more important.").

### 1. The Proposed Settlement Represents a Grossly Inadequate Discount on the Verdict Value of the Claims.

Perhaps by design, the sparse data provided by the settling parties makes it difficult to conduct an independent analysis of the potential verdict value of the claims.  Indeed, the settling parties do not disclose even the number of total workweeks or rates of pay.

But even under conservative assumptions that likely undercut the actual figures, the verdict value dwarfs the cash recovery here, in all liability categories:

Minimum Wage: Even assuming that each class member only worked for a total of 48 weeks (approximately one year of employment), there would be 604,800 workweeks.  This estimate of 48 workweeks is *lower* than the 50 workweeks estimated by the *Gradie* Plaintiffs previously.  *See Harper* Dkt. 37, at pp. 17-18.  Conservatively estimating that class members typically performed 30 minutes per workday performing non-driving tasks without pay (such as pre- and post-trip inspections, fueling, and time spent waiting for Defendant's loads to be made available for transport, etc.) and worked five days per week, this would amount to 2.5 unpaid hours per week. 2.5 hours multiplied by California's minimum wage rate of $13 per hour works out to $32.50 per workweek. $32.50 multiplied by 604,800 workweeks works out to $19,656,000 in minimum wage damages.  However, Plaintiffs are also entitled to recover an amount equal to these unpaid minimum wages as additional "liquidated damages" under California Labor Code § 1194.2, absent a showing of good faith by Defendant.  Thus, the total value of class minimum wage claims totals at least $19.6 million and climbs to $39.3 million with liquidated damages.

These calculations presume that Plaintiffs would have litigated the minimum wage claim under the theory of liability alleged in the operative Complaint—that Defendant's piece rate scheme does not cover various non-driving tasks—and not pursue the claim that "sleeper berth" time is compensable.   If Plaintiffs had litigated the sleeper berth minimum wage claims successfully (as did the plaintiffs in the several cases cited in Section III.I, *supra* and in the section below), minimum damages would increase substantially.   Conservatively estimating that class members spent approximately 8 hours per workday logged as "sleeper berth" while subject to the control of Defendant and worked 5 days per week on average, they would have 40 hours of unpaid sleeper berth time per workweek.   40 hours multiplied by $13 per hour works out to $520 per workweek.   $520 per workweek multiplied by 604,800 workweeks works out to $314,496,000, before liquidated damages.   With liquidated damages, this figure would rise to $628,992,000.

Meal and Rest Periods: California Labor Code § 226.7 requires employers to pay one hour of additional compensation at the employee's regular rate of pay as "premium pay" for each instance in which a timely off-duty meal or rest period was not provided.   *Brinker Restaurant Corporation v. Superior Court*, 53 Cal.4th 1004, 1018 (2012).   Employees are entitled to a thirty-minute off-duty meal period before the end of the fifth hour of work and another by the end of the tenth hour of work; and off-duty rest periods every fourth hour of work or major fraction thereof.   Even conservatively assuming only 4 noncompliant meal and rest periods per workweek and a regular hourly rate at California's $13 minimum wage, the verdict value in this category would amount to $31,449,600.

Wage Statement Penalties: As shown in Defendant's own contentions in its removal papers (*see* section III.F, *supra*), California Labor Code § 226(a)-(e), imposes a penalty of $100 per weekly pay period. *See* Labor Code § 226(a) and (e).   Based on the conservative estimate of 604,800 weekly pay periods, these penalties would total at least $60 million.

Waiting Time Penalties: California Labor Code §§ 201-202 require that all earned but unpaid wages are due immediately upon termination of employment.   Under Section 203, the failure to timely pay such wages triggers the accrual of "waiting time" penalties in an amount equal to the employee's daily wages, up to a maximum of 30 days' pay.   Conservatively

estimating a day's wages at $104 (California's minimum wage rate of $13 per hour multiplied by 8 hours) and assuming that only 9,450 (75% of the estimated 12,600 class members) left Defendant's employment without receiving all earned wages, this claim has a reasonable verdict value of approximately $29.4 million.

PAGA Penalties: The California Labor Code Private Attorney General Act (Labor Code § 2698 et. seq.) ("PAGA"), provides for additional civil penalties for the underlying Labor Code violations. These penalties are assessed at the rate provided under the specific statutory provision being enforced (e.g. minimum wage, overtime, etc.), or at a rate of $100 for the initial pay period and $200 for subsequent pay periods, under provisions that do not provide for a specific civil penalty. Labor Code §§ 2699(a), (f). The law is unsettled as to whether PAGA penalties may be "stacked" under multiple different provisions. But even assuming that the maximum verdict value would be a cumulative remedy of $200 for 604,800 weekly pay periods, PAGA penalties have a reasonable verdict value of more than $120 million.

Thus, a conservative estimate of the verdict value for the non-contract claims is approximately $300 million, even without the substantial additional value of the sleeper berth claims. The cash settlement amount of $3.6 million represents only 1.2% of this verdict value. It also is only 0.4% of the $900 million verdict value if the sleeper berth claims and associated liquidated damages are added. This is a discount of between 98.8% and 99.6%.

These calculations do not take into account the verdict value of the contract claims, which the *Gradie* Objectors previously estimated as exceeding $139 million. *See Harper* Dkt. 37, at pp. 18-19. These estimates were reached based on the 6,432 class members at the time of the 2016 settlement, which is about half of the total class members here. But even if this outdated estimate is used, the total verdict value for all the claims alleged is at least $439 million and would exceed a billion dollars if sleeper berth and associated liquidated damages are included. Objector Cook strongly disputes that the purported $15 million "value" of the "Debt Forgiveness" component of the settlement should be considered as a benefit akin to cash. *See* Section IV.A.3, *infra*. But even if it were, an $18.6 million settlement value would still represent an unacceptable discount from the verdict value.

OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT

### 2. The Lack of Discovery Precludes Careful Evaluation of the Class Claims

To evaluate the fairness of a class action settlement, it is necessary that "sufficient discovery has been taken or investigation completed to enable counsel and the court to act intelligently." Herbert B. Newberg, Newberg on Class Actions sec. 11.41 (4th ed. 2013). Thus, "[i]t is the responsibility of the proponents of the settlement to provide sufficient evidence to support a conclusion that the settlement is fair, and where the proponents have failed in this regard, the district court may be justified in requiring more evidence, or in declining to approve the settlement." *Gottlieb v. Wiles*, 11 F.3d 1004, 1015 (10th Cir. 1993), *abrogated on other grounds by Devlin v. Scardelletti*, 536 U.S. 1, 122 (2002); *see also Rodriguez v. Kraft Foods Group*, 2016 U.S. Dist. LEXIS 138652, *23, 2016 WL 5844378 (E.D. Cal. October 4, 2016) (citing *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1239 (9th Cir. 1998) for the proposition that "[c]ourts require that parties conduct sufficient discovery to be able to make an informed decision about the value and risks of the action and come to a fair settlement.").

Here, the settlement was reached before any formal discovery. Further, the settling parties have not provided even the most basic datapoints necessary to intelligently assess the fairness of the settlement, including the number of workweeks and the rates of pay.

Instead, Plaintiffs' counsel has provided a one-paragraph description of purported informal discovery provided by CRE, which vaguely refers to, *inter alia*, "payroll and employment data" and "various employee policies." Nordrehaug Decl (Harper Dkt. 73-1) at ¶ 13. The lack of transparency in disclosing the precise information considered raises the inference that the information was not sufficient to evaluate the claims. There is no explanation of what the policies purportedly provided by Defendant actually showed with regard to the strength of Plaintiffs claims. For instance, the settling parties attempt to release valuable claims for unpaid time when the drivers were subject to Defendant's control while in the sleeper berth, but there is no indication that sleeper berth policies were provided or evaluated. And, whatever the unspecified data and policies provided for mediation may consist of, they are no substitute for formal discovery obtained through the adversarial process.

OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT

The Plaintiffs' attempts to defend the reasonableness of the cash payouts here only confirm their failure to intelligently and meaningfully evaluate the fairness of the settlement. As discussed above, the Plaintiffs contend that the average recovery per class member will be roughly $273. *See* Section III.D, *supra*. That is provably false. The net cash recovery for settling class members is approximately $1,968,000. When this is divided by the 12,600 class members, the average recovery is revealed to be approximately $156—little more than half of the rough average claimed by Plaintiffs. The average recovery of $156 is far from adequate given the strength of the claims. *See* Section IV.A.1, *supra*. The 12,600 absent class members deserve a more intelligent assessment and better protection from putative class counsel than what has been provided.

### 3.   The "Debt Forgiveness" Component of the Proposed Settlement Provides Little Value and Results in the Inequitable Treatment of Absent Class Members.

Plaintiffs' counsel tout the recovery under the proposed settlement by emphasizing the purported $15 million "value" of the "Debt Forgiveness" component. The Plaintiffs paint this component as just another part of the common fund, but it is not a cash recovery. On the contrary, the "Debt Forgiveness" is only a theoretical benefit in the form of an agreement by Defendant not to seek the usurious interest and liquidated damages that are invalid in any event. The Plaintiffs received no value on their claims for restitution, damages, and penalties arising from Defendants' contracts and the unlawful debt collection undertaken to date.

But a practical matter, this "Debt Forgiveness" may actually be hidden harm. Absent a settlement agreement, class members facing hypothetical debt collection actions by Defendant could advance as counterclaims the same affirmative causes of action for usury and penalties that the *Gradie* Plaintiffs previously described as a "slam dunk" under California law because of the fact that Defendant's form contracts facially violate the California usury laws. *See* Section III.F, *supra*. Gradie's counsel previously estimated the value of the usury claims at $26,224 per class member, of which the interest and liquidated damages purportedly "forgiven" under the Settlement are only a small fraction. *See* Objection (*Harper* Dkt. 37) at p. 18, n. 45. However, the settlement agreement releases the usury claims for damages and penalties. *See* Settlement

OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT

Agreement (*Gradie* Dkt. 73-1) at Section XXII.C.  At the same time, the "Debt Forgiveness" provision of the settlement expressly does not forgive the bulk of the debt.  *See id. at* Section XX.B, C.  Thus, class members who participate in the settlement would give up their strong claims for damages and penalties under the usury laws, while still retaining most of their outstanding debt.  Thus, Defendant would be free and clear to seek the remaining debt without having to worry about counter claims and determinations that its form contracts violate California's usury laws.

Moreover, the purported "benefit" of the "Debt Forgiveness" is imaginary for Class members who have already paid their debts.  The same is true for class members who incurred the debts more than four years ago, and for whom California's four-year statute of limitations would bar on any action by Defendant to collect the debt in any event.  *See* Cal Code Civ Proc § 337(d).

Similarly, Defendant is not releasing any amounts claimed to be owned by third parties who may have purchased the debt from Defendant.  *See* Settlement Agreement (*Gradie* Dkt. 73-1) at Section XX.C.  Thus, the settlement provides no actual debt forgiveness to class members who are unlucky enough to have had their debt transferred to a third party.  For all these reasons, the "Debt Forgiveness" provides little concrete benefit, and may actually cause harm to class members.

Prospective forms of in-kind relief, such as this kind of "Debt Forgiveness," demand especially careful scrutiny.  *See Synfuel Techs., Inc. v. DHL Express (USA), Inc*., 463 F.3d 646, 654 (7th Cir. 2006) (explaining that compensation "in-kind" is of less value than cash payments because its purported value may never be realized); Fed Rules Civ Proc R 23 Advisory Committee Notes ("Settlements involving nonmonetary provisions for class members also deserve careful scrutiny to ensure that these provisions have actual value to the class.").

Moreover, the "Debt Forgiveness" component treats class members inequitably, relative to one another.  As explained above, class members whose debt is still owned by Defendant would theoretically be protected from actions to collect interest and liquidated damages owed (although not from actions seeking the principal), whereas class members who happened to have their debt transferred by Defendant to a third party will be out of luck, through no fault of their own.  As

another example, for any class members with outstanding debt accrued more than four years ago, and that thus falls outside the statute of limitations for debt collection actions, the "Debt Forgiveness" does not change the status quo.  Perhaps most troublingly, class members who have dutifully paid the purported debts at the usurious interest rates are punished because they have already parted with their money, whereas any "value" from the "Debt Forgiveness" will go to class members who have <u>not</u> paid their debts.  This disparate and perverse treatment makes the proposed settlement fundamentally unfair to absent class members.  *See Ybarrondo v. NCO Fin. Sys.*, 2008 U.S. Dist. LEXIS 4353, at *5-6 (S.D. Cal. Jan. 18, 2008) ("The settlement provides for the same award to class members who paid all or any portion of their debt [] as the class members who paid none of their debt.  This amounts to vastly disparate treatment among class members... The class members who sustained greater damage receive less relief than the class members who sustained lesser damage.  The parties provide no information or argument to show how their proposed settlement is fundamentally fair, adequate, and reasonable.").

> **4.      The Settlement Value Is Artificially Depressed by the Plaintiffs' Failure to Establish the Unenforceability of Defendant's Arbitration Clause.**

Plaintiffs repeatedly defend the proposed settlement on the grounds that Defendant's arbitration agreements posed a substantial risk to class recovery.  For instance, Plaintiffs' counsel suggested that class action waivers in the form arbitration agreements signed by class members "could bar any potential class action in light of the Supreme Court's ruling in *Epic Systems Corp. v. Lewis*, 138 S.Ct. 1612, 200 L.Ed.2d 889 (2018)." Nordrehaugh Decl. (Dkt. 73-1) at ¶ 6.  This is a red herring.  The *Epic Systems* case concerned the enforceability of class action waivers under the Federal Arbitration Act (FAA). *Epic Sys*., 138 S. Ct. at 1619.  But there should be no legitimate dispute that the class members here are exempt from the FAA because they are "transportation workers."  *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537 (2019) (citing 9 USC § 1 and holding that interstate truck driver was exempt from the FAA as a "transportation worker"); *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001); *Veliz v. Cintas Corp.*, 2004 U.S. Dist. LEXIS 32208, at *18 (N.D. Cal. Apr. 5, 2004 ("The most obvious case where a plaintiff falls

under the FAA exemption is where the plaintiff directly transports goods in interstate, such as interstate truck driver…").

With the FAA inapplicable, state law governs the enforceability of the class action waivers in the arbitration agreements.  The putative class members in this case are California employees whose claims are asserted under California law.  The Supreme Court of California has held that class action waivers should be invalidated where they would pose obstacles to vindication of statutory rights. *See Gentry v. Superior Court*, 42 Cal. 4th 443, 463 (2007) (holding that "for public policy reasons we will not enforce provisions contained within arbitration agreements that pose significant obstacles to the vindication of employees' statutory rights" and that where a trial court determines that "class arbitration would more effectively allow employees to vindicate their statutory rights," a purported "class arbitration waiver would be invalidated.").  Minimum wage claims brought by truck drivers are a textbook example of the sort of case where class action waivers should be invalidated under *Gentry*, given the modest recovery on a per-person basis and the obstacles posed to vindication of statutory rights by having to file thousands of costly individual arbitrations.  *See, e.g., Garrido*, 241 Cal. App. 4th at 845.

In addition, Labor Code § 229 provides that "[a]ctions to enforce the provisions of [Labor Code §§ 200-243] for the collection of due and unpaid wages claimed by an individual may be maintained without regard to the existence of any private agreement to arbitrate."  Plaintiffs' PAGA claims also are not arbitrable under California law.  *See Iskanian v. CLS Transp. Los Angeles, LLC*, 59 Cal. 4th 348, 383-384 (2014).

Defendant's only argument for enforcement would be that the provision in its form contracts designating Utah's law of arbitration would allow enforcement of the class action waiver.  But even assuming arguendo that Utah law would allow for enforcement of the class waiver, this would create an impermissible conflict with California law and violate the fundamental policies of California, as set forth in cases like *Gentry*, *supra*. *See In re Vortex Fishing Sys., Inc*., 277 F.3d 1057, 1069 (9th Cir. 2001) (setting forth choice-of-law analysis).  The provision also would be unenforceable for the separate reason that California has a materially greater interest than Utah in adjudicating this dispute.  *See id*.  Courts regularly decline to enforce

similar choice-of-law provisions under analogous circumstances.  *See, e.g., Douglas v. United States Dist. Court*, 495 F.3d 1062, 1067 n.2 (9th Cir. 2007); *Saravia v. Dynamex, Inc*., 310 F.R.D. 412, 419 (N.D. Cal. 2015) ("…this order finds that California has a materially greater interest than Texas in adjudicating this dispute inasmuch as plaintiff is located in California, and the agreements at issue were executed and performed in California, while Texas's only interest in the dispute arises out of the fact that one of the defendants is headquartered there.").

Given Defendant's slim prospects for having their arbitration agreement enforced, Plaintiffs failure here to establish unenforceability hampered their leverage in negotiations and harms absent class members by artificially dragging down the value of their claims.

### 5.   The Plaintiffs' Decision to Release Claims for Time While Subject to Defendant's Control in the Sleeper Berth Without Investigating or Prosecuting them Harms Absent Class Members

As discussed above, the Plaintiffs agreed to release minimum wage claims based on time when they were subject to Defendant's control in the sleeper berth, without investigating or prosecuting such claims.  *See* Section III.I.  The lack of pay for sleeper berth time is not a technical legal theory, but rather a serious problem that is increasingly attracting criticism from Courts across the Country.  As discussed above, analogous cases have resulted in jury awards, damages on summary judgment, and settlements that far outstrip the cash recovery here, where the litigants investigated and prosecuted claims for unpaid time when drivers are subject to their employer's control when in the truck's sleeper berth.  *See* Section III.I, *supra*.  Damages for this sleeper berth time often represent the lion's share of minimum wage damages.  For example, in *Ridgeway*, *supra*, $54.6 million in damages were awarded to the class, with about $44 million attributable to sleeper berth time. *See Ridgway*, 2017 U.S. Dist. LEXIS 66228, at *20.

As another example, in *Julian, supra*, the District Court awarded minimum wage damages of $7,839,834.48 under the FLSA, covering <u>only</u> sleeper berth time in excess of 8 hours per day (damages for the remaining sleeper berth time were deferred to trial). *Julian*, 2019 U.S. Dist. LEXIS 221423, at *18.  This result is even more striking in comparison to the recovery in the instant settlement, when considering that it was obtained under federal law as opposed to

OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT

California law.  The federal minimum wage rate is $7.25 per hour, which is little more than half of California's minimum wage rate of $13 per hour.  In addition, minimum wage damages are calculated under the FLSA as the shortfall between the employee's *average* hourly rate throughout the week and the applicable minimum wage rate, in contrast to California's more employee-protective approach of assessing one hour of pay for each unpaid hour.  *See Maravilla v. Rosas Bros. Constr.*, 401 F. Supp. 3d 886, 898 (N.D. Cal. 2019).

But even taking the damages in *Julian* at face value, the $7,839,834.48 figure represents a stark contrast to the recovery in the instant settlement. In *Julian*, there were only approximately 60,000 workweeks at issue. *Julian*, 2019 U.S. Dist. LEXIS 221423, at *4, *10-*11 (explaining that the defendant's record showed approximately 52,000 workweeks, but that damages had to be extrapolated to account for opt-in plaintiffs missing in the data).  Thus, the average recovery per workweek just for federal minimum wages attributable to unpaid sleeper berth time over 8 hours per day (a fraction of the sleeper berth damages at issue in that case), is approximately $130.  Accordingly, each of opt-in plaintiffs in *Julian* would have only had to work a little over a *single week* to reach the $156 average recovery in this proposed settlement.  Again, the $130 per workweek is for only a fraction of the sleeper berth damages at issue in *Julian*.

The claims for unpaid time while subject to the employer's control in the sleeper berth are not just valuable, but also important from a policy standpoint to address oppressive policies and working conditions.   In *Julian*, the District Court described the defendant's policies as "draconian" in that they permitted drivers to be confined to the small sleeper berth of a moving truck—a facility without a restroom—for an indefinite period, without pay. *Julian*, 360 F. Supp. 2d at 947.  On summary judgment, the District Court cited sworn declarations from opt-in plaintiffs recounting the experience of having to relieve themselves using bottles inside the sleeper berth because the truck had to keep moving to meet its deadline. *Id*. at 938.

The *Harper/Gradie* Plaintiffs' decision not to investigate these claims is troubling.  More troubling, however, is their decision to release the sleeper berth claims without investigation or discovery.

### 6. The Circumstances Strongly Indicate that the Settlement was Not Negotiated at Arms-Length.

As discussed above, class action settlements negotiated before Rule 23 certification must be even more closely scrutinized than post-certification settlements. "This more 'exacting review' is warranted to ensure that class representatives and their counsel do not secure a disproportionate benefit 'at the expense of the unnamed plaintiffs who class counsel had a duty to represent.'" *Roes*, 944 F.3d at 1049 (internal citations omitted).

Here, the circumstances indicate that Plaintiffs and their counsel are securing a disproportionate benefit at the expense of absent class members, and to the benefit of Defendant.

First, Plaintiffs' Counsel are seeking an attorneys' fees of $1.44 million, or 40% of the common fund.[4] This results in a multiplier on Plaintiffs' Counsel's aggregate lodestar. *See* Mtn. for Atty Fees (Gradie Dkt. 76) at p. 9. As Plaintiffs' Counsel concede, the 40% fee request also exceeds the 25% benchmark recognized by the Tenth Circuit in common fund cases. *See id*. at p. 2. In addition, the fee request is nearly three times the $500,000 sought by *Harper*'s counsel in the original settlement and represents almost twice as high a percentage of the common fund in the original settlement. *See Harper* Mtn. for Final Approval (*Harper* Dkt. 34) at p. 11.

There is no justification for the fee request. The instant proposed settlement was reached before class certification, and indeed before any formal discovery. The work on the case was predominantly concerned with settlement negotiation and litigating the appeal of the original failed settlement. As discussed above, the common fund under the settlement represents an

---

[4] Plaintiffs' counsel attempt to make their fee request more palatable by presenting it as a percentage of the purported aggregate "value" of both the cash recovery and the "Debt Forgiveness." However, the purported debt forgiveness is not a monetary payment, but rather an agreement by Defendant not to seek interest and liquidated damages under their contracts with class members—contracts that the *Gradie* Plaintiffs have argued are so usurious as to justify treble damages and penalties well in excess of the amount of interest Defendant alleges is owed. This should not be included in the "common fund" for purposes of evaluating the reasonableness of attorneys' fees. *See Whitaker v. Navy Fed. Credit Union*, 2010 U.S. Dist. LEXIS 106094, at *12 (D. Md. Oct. 4, 2010) (reasoning that "the members are not actually receiving a monetary payment. Thus, there is no actual common fund in this case, and this Court finds that debt forgiveness in this case cannot be equated to the creation of a common fund.").

approximate 99% discount on the verdict value of the claims.  *See* Section IV.A.1, *supra*.  Further, even though the number of class members has doubled and the release period has been extended by three-and-a-half years since the original *Harper* settlement, the instant settlement results in only about a $400,000 increase in the net amount to be paid to class members.  As discussed above, this results in a 43% net *decrease* in benefit for the individual class members.  Yet, Plaintiffs' Counsel seek over $900,000 more in fees than they sought in the original *Harper* settlement.  Granting Plaintiffs' counsel a multiplier on their fees would be a dubious reward for doing little more than settling this case for a small fraction of its value and before conducting discovery or substantively prosecuting the claims.

Second, Plaintiffs seek service awards of $12,000 each for the named plaintiffs.  Mtn. for Atty Fees (*Gradie* Dkt. 76) at p. 10.  The $12,000 payments are more than 76 times the size of the average individual cash recovery under the settlement of $156.  This discrepancy indicates collusion.

Third, the parties negotiated for a release of the valuable claims for unpaid time while subject to Defendant's control in the sleeper berth without prosecuting or even investigating them, insulating Defendant from potentially massive liability.  The *Harper* Plaintiffs saw their original proposed settlement rejected just as several analogous cases had achieved considerable success in advancing minimum wage claims for unpaid sleeper berth time.  *See* Section III.I, *supra*.  But instead of pivoting to prosecuting these and other promising claims, they coordinated with the *Gradie* Plaintiffs to negotiate a settlement that would release those sleeper berth claims, extend the release period by three-and-a-half years from the prior proposed settlement, and double the number of class members, while adding only $400,000 in additional net cash recovery for what now amount to more than 12,600 absent class members.

This decision to release the sleeper berth claims without commensurate consideration is concerning.  To begin with, the watering down of the class recovery through the extended release period alone arouses suspicion.  But the decision to do so when other existing cases posed risk to Defendant of substantial liability for unpaid sleeper berth time raises the inference of collusion.  For instance, Objector Cook is a plaintiff in a separate action against Defendant specifically

OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT

alleging unpaid sleeper berth time.  *Bode, et al. v. C.R. England, Inc.*, Case No. 3:20-cv-01620-JCS (N.D. Cal. 2020).  Defendant was notified of that action in October of 2019, while the settling parties here were still negotiating and drafting the long-form settlement agreement in this case. The final release language in the instant settlement is broadly drafted to release the sleeper berth claims alleged in *Bode*, <u>and</u> to extend the release period to cover the liability period in *Bode*.  *See id*.; *see also* Newberg on Class Actions § 13:57 (5th ed.) (observing that courts are "wary of situations in which there are multiple class suits, defendants settle one of the cases in order to preclude the other actions...").

> **B.     The Proposed Settlement Impermissibly Releases PAGA Claims for Absent Class Members.**

The Settlement Agreement here is also deficient for the separate reason that it impermissibly releases PAGA claims for participating class members.  Unlike statutory penalties, employees have no independent right to sue for civil penalties. *Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court*, 46 Cal. 4th 993, 1003 (2009) ("The Labor Code Private Attorneys General Act of 2004 does not create property rights or any other substantive rights."); *see also Sakkab v. Luxottica Retail N. Am., Inc.*, 803 F.3d 425, 435 (9th Cir. 2015) ("PAGA does not give absent employees any substantive right to bring their "own" PAGA claims."). Rather, the Labor Commissioner "owns" the right to sue for civil penalties. *Iskanian v. CLS Transp. of Los Angeles*, 59 Cal. 4th 348, 382 (2014) (the LWDA "is always the real party in interest in the suit.") . The one exception to this rule occurs when an employee properly complies with the notice provisions set forth in the PAGA and the LWDA declines to investigate the alleged violations—at that point, the employee becomes the "proxy" for the State and is authorized to "stand in the shoes" of the Labor Commissioner and sue to recover civil penalties for alleged Labor Code violations on behalf of other employees.  *See Baumann v. Chase Inv. Servs. Corp.*, 747 F.3d 1117, 1123 (9th Cir. 2014).

As a result, "the employee plaintiff represents the same legal right and interest as [the state's labor law enforcement] agencies—namely, the recovery of civil penalties that otherwise would have been assessed and collected by the Labor and Workforce Development Agency."

*Esparza v. KS Indus., L.P.*, 13 Cal. App. 5th 1228, 1241 (2017)).  Thus, it is the employee plaintiff representative who releases the PAGA claims as a proxy for the state—not absent class members.  And yet, the settlement agreement here expressly releases PAGA claims for class members.  *See* Settlement Agreement (*Gradie* Dkt. 73-1) at Sections II.G, XXII.B.

In this connection, the purported right of absent class members to exclude themselves from the settlement is an empty promise when it comes to the PAGA claims.  Only the state can decide whether to accept a PAGA settlement.  But the notice here misleadingly suggests that individual absent class members have that option. *See* Notice (*Gradie* Dkt. 73-1) at pp. 6-7.  The settling parties should not be permitted to use opt-out rights as argument for why absent class members are protected, when the opt-out "rights" are futile.

**V.     CONCLUSION**

For all the foregoing reasons, the Court should decline to approve the proposed settlement.

Dated: August 31, 2020                         Respectfully Submitted,

/s/ Brian M. Rothschild
Brian M. Rothschild
**PARSONS BEHLE & LATIMER**

*Attorneys for Objector, Marty Cook*

/s/ Nathan B. Piller
Nathan B. Piller (pro hac vice pending)
**Schneider Wallace Cottrell Konecky LLP**

*Co-Counsel for Objector, Marty Cook*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 31th day of August, 2020, I served a true and correct copy of the foregoing **OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT BY OBJECTOR MARTY COOK** by filing a true and copy with the Court's ECF filing system, which sent a copy to each of the following:

- **David B. Dibble**
  ddibble@rqn.com,dvandenakker@rqn.com,docket@rqn.com
- **Scott A. Hagen**
  shagen@rqn.com,dvandenakker@rqn.com,docket@rqn.com
- **Drew R. Hansen**
  dhansen@nossaman.com
- **Russell T. Monahan**
  russ@cooklawfirm.com,russell@cooklawfirm.com
- **Kyle R. Nordrehaug**
  kyle@bamlawca.com,norm@bamlawca.com
- **Lauren I. Scholnick**
  lauren@utahjobjustice.com,dunja@idahojobjustice.com,kati@utahjobjustice.com
- **Brian F. Van Vleck**
  bvanvleck@vvlawgroup.com,mkost@vvlawgroup.com,skluft@vvlawgroup.com

*/s/Brian M. Rothschild*